Good morning, Mr. Goldman. Good morning, Your Honors, and may it please the Court, Brian Goldman for DomainTools. And I'd like to reserve four minutes for rebuttal, if I may. Preliminary injunctions aren't normally issued in contract disputes, and this case should not have been an exception. Injunctions like this are rare, even after judgment, because the presumptive remedy for breach of contract is money damages. So I'd like to start there, with the lack of irreparable harm, because if there hasn't been an adequate showing of harm, then the Court doesn't need to go any further, as it said in Center for Food Safety v. Vilsack. DNCL bore the burden here of putting on concrete evidence that it was likely to suffer irreparable harm absent immediate relief. But all DNCL has advanced is a hypothesis of reputational harm, one that isn't backed by the record and doesn't even make sense, because the only who is information that DomainTools has is information that was public, because DNCL put it online for everyone to see, for over a decade, for free, after advising registrants that it would be available to all as a matter of public record. That information is the who is responses? Correct, Your Honor. The responses, the only information that DomainTools has from DNCL or any of the other 1,500 registries in the world is information that is public, and that's because historically, for decades, the who is system has been understood as a critical set of public information that allows the Internet to operate openly and safely. Does DNC allow the public to download the whole of their who is treasure? So the DNC has, prior to the ERPO, when this was available to anyone, there's no password requirement, there's no sign-up requirement or anything of the like. Anyone had the ability to access this information over port 43. DNCL has imposed various terms of service over the years. We have a couple of them in the record here. We don't have the ones that were in place when DomainTools first began accessing the .nz who is server in 2006. That was before DNCL even existed, so the term certainly didn't look like this back then. But those terms are similar to terms that define the standard norms in this industry, which say that who is information is public and can be used for identifying purposes and for cybersecurity purposes. The scourge of misuse of who is information has historically been commercial solicitations, and that's why that's called out both the means of collecting information for commercial solicitations and the act of commercial solicitations are called out in the terms. That's also reflected in what DNCL tells its registrants at ER 152 and ER 155. It says your information will be available to all as a matter of public record. That means law enforcement can use it, but commercial solicitors won't be able to use it. Similarly, that was the fact pattern in register.com versus Vario. The harm that Vario was committing was sending out commercial solicitations to new domain name registrants who had used register.com, and that was causing irritation and people to think that register.com was sending them spam. And it's not a coincidence that you see commercial solicitations continuing to pop up because that has been the restriction that has been understood to apply in this context. The problem with the way that DNCL is reading its terms is that it would bar the very purpose that who is information has served for decades in this field. And under Washington law, terms have to be understood in context. Let me just take a step back here and say, obviously, we're here on a preliminary injunction. And for DNCL to get specific performance at the end of the case, there would need to be, quote, no doubt is the standard under Washington law. Crews and hedges are the best cases there. No doubt that A, a contract was formed, and B, that the terms clearly mean what the party says they mean. So DNCL is not going to be able to meet that standard, even if it secures judgment and establishes a breach of contract. But here at a preliminary stage, before DNCL has even been put to its proof, there certainly isn't the clear entitlement to relief on the facts and the law that Garcia versus Google requires for an injunction like this. And the same is true with respect to recently, is that there must be concrete evidence of harm. There cannot be pure speculation or hypothesis. There has to be actual tangible evidence. And I think it's helpful to look at Disney versus VidAngel and Adidas as two examples of what suffices and what doesn't suffice with respect to irreparable harm. What Disney versus VidAngel says is you can draw one inferential step from the evidence that's in the record. So there, it was that Disney had received complaints from its legitimate licensees about the fact that there were unlicensed services also streaming Disney content. And it was one very simple, logical, inferential step to say, you've received complaints about unlicensed services. What about the harm to the registrants? The people who are the whole, whose information is dispersed and the people that are getting the advertisements and the unsolicited advertisements, what about their harm? So let me respond to that in two ways, Judge Marquez. First, just by way of clarification, there's no allegation that registrants here are receiving commercial solicitations and the like on account of their information being out there at all, let alone on account of domain tools using their information in cybersecurity products. But second, the evidence, I'm going to give you three answers, I'll correct myself. The second answer is that the question is harm to DNCL, who's the plaintiff here. DNCL is not trying to assert third party standing on behalf of the registrants. I don't think the registrants themselves would have a cause of action against domain tools. So any allegation about harm to registrants can be relevant only when viewed through the lens of, does that affect the reputation of DNCL? And that's why they offer this rather contorting... It does affect the reputation of DNCL to the extent that they're not able to effectively enforce the terms of use, right? That's the linkage to the customer complaints about privacy. That's not correct on the record as DNCL has established it here. So the only evidence in the record is of customer complaints prior to the IRPO asking for a privacy option. And so what DNCL wants to do is draw three inferential leaps from that concrete evidence that's in the record. Leap one is that they want to say that the advent of the IRPO in response to those complaints was a critical piece of bolstering DNCL's reputation. I think even that isn't founded because they offer only a small handful of complaints and the actual solution they offered in the IRPO is much less privacy protective than what the customers were even asking for. So there isn't reason to think that IRPO bolstered the reputation. But even if we spot them, that first inferential leap, as the court did in Adidas with assuming that Adidas had established a high value view of its brand at the first inferential step, the next two leaps clearly are not established. So leap two is saying that domain tools has undermined the promise of the IRPO and this reputational boost that the IRPO has provided. But the district court expressly found that DNCL had made no such promise, no promise with respect to prior already public information, that that would somehow be clawed back or that that public disclosure would be negated. DNCL's own statements to registrants show that as well. So those statements to registrants first promise only that new query results will be protected and will be public record even now. That's ER 152, which is the post IRPO statement. Second, DNCL continues to advise registrants that, as I've said, their Whois information will be public. And third, DNCL's remedy against unauthorized queries, this is what DNCL tells its registrants it will do if there are unauthorized queries, is at 282 to 283. And DNCL says it will cut off access to the Whois server from unauthorized queriers, which it did with domain tools, and we complied with that. But it says nothing to registrants about clawing back information that's already public. And we know that registrants understood that that information couldn't be clawed back, because even as they were asking for greater privacy protections, they said, we don't want our information out there in the first place, because once it's posted online, there is no getting it back. Isn't that the reputable harm? You can't correct it once your information's out there and their reputation is, you know, is damaged. And how, if they win their lawsuit, how do they recuperate? Or how do they, they can't be made whole. But my point, Your Honor, is that the only information that we're talking about here is information that was already made public. It was made, because the only information we have is information that was already broadcast to the public. So this in- But you're taking it and you're, it's made public by one person searching. But when your company goes in, they take massive amounts at a time, put it, it could go on another registry, and then disseminate it, which the harm is different than the one person going in and taking, you know, information on one person versus, I don't know, thousands of people? Well, Your Honor, I disagree that it's different for two reasons. First is that we are not the only party out there that collects who is information. This is historically how cybersecurity professionals across the world have operated to protect banks, to protect retail institutions that are trying to protect customer social security numbers and credit card numbers. And so we are one of many services that has this information. Similarly, again, this information was broadcast for all to see. We don't know how many people have downloaded any amount of it. Does your argument, because everybody does it, then it's okay? So it's not in the way Your Honor is suggesting. It's that this is the way that who is information has been meant to be used. This is why there is a dedicated channel called Port 43. I thought it was so that if there was an issue with the website, then the person could be contacted. That was its original purpose under the ARPANET in the 1970s. The reason it has persisted for decades later is because it is one of the rare identifying pieces of information that exists in the anonymous expanse of the internet. And it provides a critical tool. And there are examples in the record. I think ER 205 is a really good example of how the existence of this information has allowed intellectual property owners and companies and law enforcement to crack the case and both solve cybercrimes, but I think even more importantly, to stop cyberattacks before they even happen by recognizing that there are threats originating from particular domains and intervening to bar access before a hack can occur or even be completed. And let me just emphasize that DNCL, that, pardon me, Domain Tools, has very close relationships with hundreds of the top level domains around the world. Our work depends on our ability to access this information. When we are cut off, which has almost never happened, but as DNCL did here, we of course respect that and we can no longer gather that information, but we have every reason to work closely with the top level domains that manage this information and we do. And the reason that this whole ecosystem works and the reason that DNCL is the outlier that has taken action against this is because it has been understood for decades that this is the one critical public piece of internet identifying information. I want to be very clear, DNCL absolutely has the right to cut off prospective access as it has done and we have respected that, but what they cannot do is retrospectively apply that new concept that they have of shuttering port 43 to information that they already sent us for over a decade in response to who is queries. If I could reserve my last minute. Good morning, your honors. I'm Steve Reckford. I'm the director of the Office of Information and Drummage and I'm appearing this morning on behalf of the plaintiff domain name commission limited. Your honors, DNCL sought an injunction in this case because domain tools does exactly what DNCL's terms of use prohibit. What the record shows is that domain tools surreptitiously downloaded 94%, 94% of DNCL's database. It created a shadow database in clear violation of the terms of use and then it used that database to do things that DNCL's terms of use flatly prohibit. It's here today because it wants to resume doing those things even though it knows the terms of use flatly prohibit it. This raises a very fundamental question, which is who controls the use of the registrant data for .NZ, New Zealand domains? Is it DNCL, a New Zealand non-profit corporation that maintains the data, that has protection of registrant's interest in the registrant data as its mission and that flatly prohibits the creation of a secondary database? Or is it domain tools, a for-profit company that got the data surreptitiously for free in breach of terms of use is now holding it in a shadow register in breach of terms of use and wants to publish it in breach of terms of use? Judge the main reason for the preliminary injunction, why it was issued, to prevent them from publishing that information or has it already been dispersed? Well, good question, Your Honor. I mean, I think that what Judge Lasnik was principally focusing on is the fact that they were using the database that was improperly created in the first place to publish historical data and that DNCL's terms of use specifically and flatly prohibit the publication of historical data. And there's good reasons for that, because once you build up a secondary database and you use it to publish historical or non-current data, essentially you then become the controller of the interest of the registrants, right? Because you can prevent, for example, what DNCL did here, which is they developed an individual registrant privacy option that allowed people to say, you know what, I don't want my data to become public. And yet, because the domain tools database is out there, that secondary database is out there, they can undermine that by publishing historical data that people have now said we want to be private. And as Judge Lasnik found, that is simply sabotaging what DNCL's mission was. And so I think it's principally that the injunction was targeted at the publication. I think, you know, Judge Lasnik did not order them to take down the information, even though the maintenance of the secondary registry is also against the terms of use. And so I think principally it's directed at what they do with the data as opposed to their maintenance of the data, because we did not ask them at the end of the day. We initially on the motion asked them to take the data out of their database, but at the end of the day, the request was  Would you please address Mr. Goldman's first point that he claims that DNCL has not established irreparable damage and regular monetary damages would be sufficient? Well, it's interesting, Your Honor. I think that Your Honor has characterized what Mr. Goldman said correctly, but I don't think what Mr. Goldman said is actually backed up by the full scope of his argument. And here's what I mean by that. He definitely said that But I did not actually hear him identify how the adverse effects on DNCL could be remedied by money damages. And I'll explain in a minute how that is so. But let's start with how Judge Lasnik looked at this. Judge Lasnik was aware, because of the extensive evidence that was presented to the Declaration of Mr. Kerry, that New Zealand had gone through an extensive consultative process as to what sort of who his data should be disclosed, when it should be disclosed, and in what circumstances, and to whom it should be disclosed. That lasted over 20 months, starting in October of 2015, public meetings throughout New Zealand cities. And so we know that to that community of .NZ domains, whose data is managed by DNCL, we know that through that community, the privacy and security of that data is important. What the core importance of that to this community, if DNCL can't enforce its terms of use and can't maintain control over its data, that is likely to adversely affect its ability to obtain and retain registrants. And by the way, let me pause for a moment before I continue with that answer. It's a long answer, I know. But I want to pause and point out that all of the terms of use here are focused on allowing DNCL to continue to be the manager of the data and not let somebody else take it over. What do I mean by that? The terms of use prevent the secondary registry, right? Prevent somebody from coming in and taking it and building their own registry. Prevent somebody from using historical data, publishing historical data. That means that we manage it. We only have the current data and that's what we supply. Prevent somebody from publishing in bulk. Prevent people essentially from doing those things that would eliminate DNCL's control. If they lose control over the data and cannot guarantee that they can control security and privacy and the like, what Judge Lasnik found is that that's going to adversely affect the ability to obtain and retain registrants, which is essentially equivalent to saying injury to goodwill. Goodwill historically has been the category of damages or loss or injury under a contract that is deemed not compensable in damages. There's a long line of cases from this court holding that, including, in particular, the Adidas versus Sketchers case. I believe it's also discussed in VidAngel. And so those are circumstances that constitute irreparable injury. And I might add, since Mr. Goldman referenced the VidAngel case, that was a case where loss of control, and remember here we're talking about loss of control of the data, loss of control was central to what was found to be the irreparable injury. Because there, it was a question of losing control over distribution of copyrighted material from Disney. And what the trial court found, and this court affirmed, and I believe, Judge Baer, that you were on that panel, was that interference with the basic right to control how, when, and through what channels this content was released was irreparable injury. So too here. Interference with the basic right to control what happens with the data that has been entrusted to DNCL is irreparable injury. Now it is true, as Mr. Goldman says, that we cannot point you to a specific customer that's been lost, a specific registrant that says, I'm not going to be doing business with you. But that misses the point. Because the requirement is not to show that we have already suffered injury, the requirement is to show that we are likely to suffer injury if there has not been an injunction. And what is the evidence on that? The evidence on that, Your Honor, is, largely consists of what I just described, Your Honor, in terms of the consultative process and the importance of these issues to DNCL. And the fact that, the fact that if we lose control over our data, we no longer can make assurances to our registrants, as we historically have, that we control the data, we can determine how it's released, and those assurances are implemented and effectuated through our terms of use, which ensure that the data remains in our control. So once you take that control away, that, as Vidangel and other cases have held, that is the sort of thing that amounts to irreparable injury. And I would add, Your Honor, that there was also, I think embedded within Judge Lassner's opinion, an equally important irreparable injury, and that is the damage to DNCL's mission. This is another consideration that this Court has found to constitute rise to the level of irreparable injury in the Valle de Sol case, Valle de Sol v. Whiting, a case where there was found irreparable injury based upon a damage to a nonprofit organization like DNCL to its central organizational mission. And there are district courts across this circuit that have applied Valle de Sol to find damage to organizational mission as a sufficient irreparable injury. And here, here we have Judge Lassner specifically finding that domain tools conduct here was sabotaging the efforts to implement a new device for protection of privacy of registrant data, undermining, undermining one of the central missions, because DNCL's mission is to protect registrant rights. It's implemented, if you look at Section 21.2 of the Operations and Procedures, that's at ER 282, it's undermining its mission, which is described there, and I quote, to protect the security of the data in the register from unauthorized or abusive use. That is one of the purposes for which this nonprofit organization exists. And control of registrant data is central to that mission, because if you lose control, you no longer are able to deliver on that promise to your constituency. And that's why the terms of use focus on preventing third-party control through bulk downloads or secondary registers. And absent an injunction, absent an injunction, what will happen is that domain tools, because it now has 94% of the data, domain tools will get to make the judgments, make the call, make the decisions as to what happens to the data that was entrusted not to domain tools, but to us. And I think it's important to understand, Your Honors, because domain tools cloaks itself in this mantle of protecting Internet security, I think it's important to understand when you think about how it undermines this mission, how it got this data. Because it didn't come through the front door, and I believe, Your Honor, Judge Marquez, I think you asked Mr. Goldman a question about, you know, could they go and get the data in bulk. It didn't knock on the front door and say, DNCL, will you give us all the .NZ data? It didn't do that. It didn't do that because it knew that wasn't permissible and that DNCL would not give up control over the data that was central to its mission. So what it did, and this is at, if you look at basically two places in the record, ER 256 of paragraph 59, which is a declaration from Brent Carey, who is the commissioner of the DNCL, and look at ER 223, which is Mr. Klatt's declaration, Mr. Klatt from domain tools, what you find is that they actually took steps to circumvent controls that DNCL put on access to port 43, that were put there specifically to prevent what they did. They circumvented controls by creating a distributed network so we wouldn't recognize their repeated searches, and they used those repeated searches not to query the network, or pardon me, not to query the who is service to get information in specific domains, but to collect that information and create their own database. They weren't responding to customer needs. What Mr. Klatt says in his declaration, he calls it our collection system. So essentially they were out harvesting data surreptitiously, knowing that it wasn't something we would voluntarily give, and in doing so they were undermining a central mission of DNCL. So reversing the injunction, Your Honors, will not simply harm DNCL's mission, it will essentially eviscerate that mission. It will make it so it cannot be accomplished because we will no longer be able to call the shots as to what happens to the data that registrants have entrusted to us. Now that's essentially what I have to say on irreparable harm, but I do want to make a couple of points with respect to one of the things that Mr. Goldman repeatedly said. And I believe that the way he expressed it to the court was to say that this information isn't worthy of protection because I think he used the words widely available. It had been widely available for decades. That's not quite true. To me widely available means that it's published. You go to a website, you scroll through the website, there's the information. That's not true. What is true is that this information was available for lookup on the Who Is service. So if you, as Your Honor pointed out, you know the point of this is to allow people to check into domains, find out whether a domain is available, find out if there's an issue with the domain. So you could go to the service, you could plug in a domain name, you could get the Who Is data back privately. It was not publicly available in the sense that it was published to the world. And there's no evidence in the record suggesting that of the 700,000 roughly domains on the .nz domain, there's no evidence in the record that all of those have been subject to search. In fact, the likelihood is a relatively small fraction have been. And the high likelihood is that in this shadow database that DNC, pardon me, that Domain Tools has created, there are likely domains and registrant data in there that have never seen the light of day except for them harvesting it to create their own shadow database that they never were supposed to have in the first place. Is there a way to control the Port 43 way of searching for the data? Well, we tried to, Your Honor. I mean, that's exactly what, if you look at paragraph 39 of Mr. Kerry's declaration, which is that again, the ER 256, what he says, we had controls in place to try and prevent this sort of bulk harvesting. But what our investigation showed, and DNCL, pardon me, Domain Tools did not deny this. What our investigation showed was that Domain Tools use what's called a distributed network, which means that they used a network of computers all around the world to call in so that you don't see a pattern, so that you don't see them doing this harvesting because they know it's wrong. And that's why it is ironic that they now cloak themselves in the mantle of needing to be in front of the court to protect Internet security when what they did was nothing more than what a hacker would do to get into the system. And so that is a deep irony in this case. Your Honor, I only have a couple of seconds left. So I would simply ask at this point that the court affirm the preliminary injunction that was entered with good reason by Judge Lassley. Thank you, Your Honors. Thank you very much. Mr. Goldman, we'll give you two minutes. Thank you, Judge May. I appreciate that. I'll make two points very quickly in that time. First, the critical piece that's missing here with respect to irreparable harm is the same thing that was missing with respect to the cross-court shoe in the Adidas case, which is some concrete evidence other than an employee of the plaintiff's own say-so that connects the alleged harm to the conduct of the defendant. So what would they have had to show here? It would be some evidence that .NZ registrants either left the domain or were even mad at ERPO on account of the fact that security firms still had their information that had previously been made public. I'm at a loss with your acronym ERPO. Sorry, the privacy option that DNCL has implemented. So the comments that they point to expressing displeasure with DNCL are all before that program was implemented. But their whole premise, the hook of their argument is that they say the ERPO promised registrants that it would protect the privacy of this data, including going back in time to when it had previously been made public. They say at page 54 of their brief that that's the reason why it's not fair to say that they delayed in bringing the suit because it was only upon the beginning of the ERPO that their irreparable harm even ripened. You say they need more than just an employee saying we're worried about the privacy of our registrants. Correct, Your Honor. That's exactly the type of evidence that was found insufficient with respect to the cross court shoe in Adidas that was found insufficient in Herb Reed. And I think Titanus Lightshop, which is an unpublished case, offers the most vivid illustration of that, where there was a wonderful theory that had been spun out by the and DNCL made the choice to come to court on a complaint without taking the time to build a record. But this information, any such complaints would have been in its control. Judge Bay, if I could have just 10 seconds to respond to the point that Mr. Rummage made about surreptitious and hacking activity, because I have to resist that. Port 43 is the front door. This is what has historically been used to get this information. And that's why there is no access restriction on it. With respect to Mr. Rummage's suggestion of somehow surreptitiously evading that, we have been absolutely forthright about how we collect information. We do it in a way so as not to clog the channels of Port 43 by proceeding to obtain that information slowly. We are upfront about that with DNCL, as we are with hundreds of registries around the world, aware of how this information all fits together. We ask the court to reverse. Thank you very much. Thank both counsel for a very interesting and informative argument. And the case of Domain Name Commission Limited versus Domain Tools LLC is submitted.
judges: Bea, Nguyen, Marquez